UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Shirley J. Heitkam | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 CV 50314 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shirley J. Heitkam applied for Social Security disability benefits in 2012, when she was in her mid-fifties. She alleged that back, hip, feet, and other body pains from fibromyalgia and arthritis, and obesity make it difficult to walk, stand, or even sit for sustained periods. She allegedly spends much of her day in a recliner with her feet elevated. These conditions also cause her hands to become sore after prolonged use. She has histoplasmosis, a fungal infection, that led to a partial loss of vision in her right eye. Because of this limitation, she claims to get headaches after 10 to 15 minutes of reading or looking at a computer screen. The latter assertion is critical. Given her age and other factors under Social Security disability regulations, the sole issue is whether she could work as a data entry clerk, a job requiring typing and working at a computer screen. It was the only one of her past relevant jobs at the sedentary level and, thus, the only one of those jobs she could possibly do now.

The administrative law judge ("ALJ") held two hearings, with a different doctor and vocational expert testifying at each. Although these experts opined about several issues, the eye issue received the most attention. There was much back and forth about how to describe this

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

particular impairment and what limitations, if any, it imposed. In fact, it appears a second hearing was held to address this particular issue. In addition to the hearing testimony, plaintiff's treating ophthalmologist, Dr. Suresh Chandra, submitted several opinion letters. In a written decision, the ALJ found that plaintiff's eye (and other) problems would not prevent her from working full-time as a data entry clerk. The ALJ found (among other things) that the two testifying doctors were more credible than plaintiff's treating doctor. Plaintiff now seeks a remand, raising a plethora of arguments attacking almost all aspects of the decision. Although this Court finds that many of these arguments would not warrant a remand on their own, the Court concludes that a remand is required based largely on the unresolved eye issue.

To understand this issue, which will be the focus of this opinion, it will be helpful to chronicle at some length how it was addressed in the two hearings. The hearings provide a peek behind the curtain of the ALJ's reasoning. These hearings contain more detail and analysis than was included in the ALJ's decision, which glosses over certain questions raised in the hearings.

The first hearing was held on May 5, 2014. Plaintiff testified that she "cannot [] stare at a computer screen for hours on end" and that she gets "headaches in the back of [her] head if [she looks] at one thing too long." R. 62. She described the problem as being a strain on her left, or "good," eye that resulted from her not being able to fully or properly focus with the her right, or "bad," eye. R. 69. This problem was one reason she quit her last job as a bank teller in 2007. She stated that, because of the eye problems, she had to double and triple check deposit and cash back amounts.

The ALJ called Dr. Gilberto Munoz, whose specialty is listed as "Family Practice," to testify as a medical expert. R. 147. He identified plaintiff's impairments as follows: "Fibromyalgia, hypertension, chronic kidney disease, right eye blindness, bilateral hip pain, and

2

low back pain." R. 73. He opined that plaintiff had the residual functional capacity ("RFC") to do sedentary work subject to various restrictions. Relevant to the eye problems, plaintiff could not "drive for defensive purposes," could not work in any "safety sensitive positions," and could not be around heavy machinery or work at heights. R. 74. The ALJ then asked whether plaintiff would "be limited to monocular vision."[2] *Id.* Dr. Munoz answered that, "[y]es, she is, but her doctor diagnosed 20/20 vision." *Id.* The ALJ asked about allegations of headaches from "us[ing] that good eye to read the computer" and whether that was "a possibility." R. 74. Dr. Munoz answered with only the terse comment that this possibility was "[v]ery unlikely." *Id.* Like Bartleby the Scrivener, Dr. Munoz did not offer an explanation for this conclusion, nor did he express any doubts or qualifications.

Recognizing this explanatory gap, plaintiff's counsel later in the hearing probed further. In the following colloquy, counsel elicited at least a partial explanation, although it is still one that (to this Court's layperson eyes) is not entirely clear:

> Q   Wouldn't you agree, Doctor, that the headaches and the eye strain due to the use of the one eye to focus on a computer or on reading would cause—I mean, could be caused by this histoplasmosis?
>
> A   People with monocular vision with her case, they have problem with depth perception. Some objects are not the same, but that wouldn't be an issue because for the computer she should be okay.
>
> Q   She'd be able to use a computer eight hours a day without any unscheduled breaks and not have these symptoms? Is that what you're saying?
>
> A   No, the eye on the left is perfect. It's 20/20. Actually, it's better than average for her age.
>
> Q   I'm talking about the eye strain causing headaches, the eye strain of using one eye to do –
>
> A   Which eye would feel strain? In order to strain your eye, you have to have vision.

---

[2] It appears that the ALJ introduced the phrase "monocular vision" into the discussion.

> Q  The right eye is the eye that has no sight at all. The left eye is what she's using normally and then to compensate for the lack of the right eye and she's saying that that causes her eye strain to the point that she has to take these frequent breaks. Wouldn't that be reasonably consistent with her condition?
>
> A  I feel that you're asking me if I find an explanation for that and I tell you I didn't. I know that she has monocular vision. I am admitting to that. On her left eye, she has perfect vision on the left eye. I don't know how [you can] strain your good eye if it's normal.
>
> Q  You're saying you couldn't get eye strain from using your eye, using one eye to do computer work eight hours a day? That's impossible to get eye strain that way?
>
> A  You wouldn't have to deal with it if it is normal. You get eye strain in your eye [that] doesn't work. That one works perfectly.
>
> ALJ:  I think what he's saying is he can't explain what it is.

R. 75-76. It is worth pausing to note several points. The precise issue plaintiff's counsel focused on initially is whether headaches "could be" caused by the histoplasmosis—in other words, whether they were *possible*. Another point is that Dr. Munoz introduced the concept of depth perception as being relevant to the analysis. Another emerging question suggested by this exchange is the relevance of a single eyechart test (*e.g.* "20/20 vision" in one eye) to the broader question of whether headaches could result from using only that eye for eight hours or so of typing in a day.

The next witness was a vocational expert, Richard Fisher. His testimony was brief. The ALJ asked him two hypothetical questions. The first question was based on Dr. Munoz's RFC, and asked whether a person with plaintiff's age, education, and work experience, who was limited to "sedentary work, except we have occasional postural and monocular vision" and who was limited to "safety sensitive positions" and "no unprotected heights, no dangerous moving machinery," would be able to do her past relevant work. R. 77. Mr. Fisher stated that plaintiff

4

could work in her prior job as a data entry clerk. Mr. Fisher did not discuss what the specific duties of this job were. The second question added the qualification that plaintiff would need to take a 5 to 10 minute break every 20 minutes, a limitation presumably designed to account for the alleged eyestrain. Dr. Fisher opined that this qualification would eliminate all work for which she was qualified. At this point, plaintiff's attorney stated that he wanted "to get a medical source statement from the ophthalmologist." R. 77. The following colloquy ensued:

>ALJ: Okay. Make sure any significant findings I can understand, okay?
>
>ATTY: Okay.
>
>ALJ: I have a little trouble with ophthalmologists. [] They throw a lot of figures at me which I don't understand.
>
>ATTY: No, I'm going to ask him about the eye strain and how that's reasonably consistent with her problem.

R. 78.

On June 4, 2014, plaintiff submitted a letter from Dr. Chandra, which states in pertinent part as follows:

> Shirley Jean Heitkam was last seen on April 8, 2014. She carries a diagnosis of histoplasmosis. The condition has affected her right eye more than her left eye. On 4/8/14, her visual acuity was 20/100 with loss of central vision in her right eye, and 20/20 in the left eye. Because of the severe visual loss in her right eye, her depth perception has been compromised and she has eye strain after prolonged work involving visual concentration. Currently, her eye disease is stable but her above symptoms continue.

R. 492.[3]

A decision was made to hold a second hearing with a new medical expert. Although the record does not state who made this decision or why they did so, it is reasonable to assume that it was related to the unresolved eye issue. The second hearing was held on August 12, 2014.

---

[3] Dr. Chandra is a professor in the Department of Ophthalmology and Visual Sciences at the University of Wisconsin. R. 492.

5

Plaintiff was present but did not testify at any length. The ALJ began by acknowledging that plaintiff had submitted Dr. Chandra's letter as well as a letter from Susan Entenberg, a vocational expert plaintiff hired. In this letter, Ms. Entenberg opined as follows:

> The DOT[] indicates that the data entry clerk requires constant near acuity. Ms. Heitkam stated in Exhibit 15[E] that she was required to type 95 wpm with 95% accuracy, therefore requiring constant near acuity with necessary precision. Occupations most affected by acquired monocular vision loss are those that require close work, vehicle operation and work demanding prolonged visual vigilance. Close work is generally regarded as visual tasks within approximately three feet of the individual. Her work as a data entry clerk required close work and prolonged visual vigilance. Given the hypothetical of sedentary work with monocular vision, Ms. Heitkam[]'s work as a data entry clerk would be precluded as she typed constantly with great accuracy.

R. 293.[4] This statement introduces more vision-related concepts, such as the phrase "constant near acuity." One issue in assessing this case is that these technical terms were often introduced in isolation by the various witnesses, and it is not clear whether or how they are connected. Interestingly, Ms. Entenberg seems to take the view that monocular vision (however that term is defined) would affect both driving and typing equally, a conclusion that appears different from that of Dr. Munoz.

After these preliminaries, the ALJ called Dr. Ronald Semerdjian to testify.[5] He summarized plaintiff's medical history in some detail, recounting procedures (such as injections) performed to address plaintiff's various problems (such as musculoskeletal issues related to arthritis). He noted that plaintiff, who stated that she weighed 233 pounds, qualified as "just short of morbid obesity." R. 37. At the end of his narrative, Dr. Semerdjian identified the eye problem and near morbid obesity as the "major" issues affecting plaintiff. R. 40. The ALJ asked whether Dr. Semerdjian agreed with Dr. Munoz's earlier conclusion limiting plaintiff to

---

[4] According to her resume, Ms. Entenberg has worked (among other jobs) as a vocational expert for the Social Security Administration since 1982. R. 294.
[5] Dr. Semerdjian's specialties are listed as internal medicine and pulmonary disease. R. 189.

6

sedentary work. After some back and forth about the number of pounds plaintiff could lift, Dr. Semerdjian agreed with this limitation. The ALJ next asked whether plaintiff would "be limited to monocular vision." R. 41. Dr. Semerdjian answered as follows: "Well, her depth perception will be compromised as has been mentioned but 20/100. She has vision in the right eye. It's just that it's going to be limited significantly. I'll go back and look at Dr. Chandra's [opinion]. I looked at that originally." R. 41. The ALJ then asked about the limitations proposed by Dr. Munoz to address the "monocular vision" (*i.e.* no safety positions or moving machinery) and Dr. Semerdjian stated that he "would agree with that." *Id.* Plaintiff's attorney then asked questions, and the following colloquy ensued:

> Q  Dr. Chandra said that [plaintiff would] be subject to eye strain after prolonged work involving visual concentration. Would you agree with this opinion?
>
> A  I'm not an ophthalmologist, but I think that would be accurate. I think that's a reasonable conclusion to draw from what I see.
>
> ALJ:  Okay. Here's the problem I have with that. I'm glad you mentioned that. My question would be essentially we're treating her as being blind already. Why couldn't she just wear a patch? The reason I saw that is what he's basically saying is even though she's technically considered to be blind in that eye she actually is seeing with it, and if she's working, she's going to end up using both eyes, so my understanding is one of the remed[ies] for that is –
>
> ATTY:  Well, if it boils down to this one job of data entry, that required visual concentration and required 95 percent accuracy. It required that she work at a fast pace. It required that she decipher handwritten information. She was taking insurance applications that were handwritten and then putting them into the computer, and so she'd have to decipher the handwriting of these agents, and so that would be difficult to do with one eye because it would require visual concentration and would cause eye strain on the good eye. []
>
> ALJ:  Yeah, I didn't necessarily—see, here's the problem. I didn't necessarily understand Dr. Chandra to be saying that. Let me look around.
>
> ATTY:  No, he does not.

7

> ALJ: We might actually need to have the doctor clarify that because that's the problem I have is that he's talking about the right eye causing eye strain and that's certainly going to be the case. I wonder why there couldn't be some device such as a patch or something to reduce stress on the eye. If you're saying that the left eye will take on additional responsibility for the strain, then maybe that's an issue.
>
> ATTY: Right.
>
> ALJ: And a doctor should know that. I don't think Dr. Semerdjian answered the question.
>
> ATTY: Okay, so if I can try to get clarification whether the left eye doing all that work would cause, you know, additional strain.

R. 42-43. To again pause the narrative and offer some interim commentary, the Court notes that Dr. Semerdjian's first answer agrees with the general conclusion of Dr. Chandra's letter—namely, that the eye damage from plaintiff's histoplasmosis *in theory* could cause headaches after extended computer use, just as plaintiff was alleging. Put differently, Dr. Semerdjian's testimony is at odds with Dr. Munoz's earlier testimony on this issue. Another point of contrast between these two doctors is that Dr. Semerdjian concedes that he is "not an ophthalmologist" and hedges his statements with phrases such as "I think," suggesting he viewed his opinion as tentative to some degree. Midway through this colloquy, the ALJ interrupted by announcing that he had "a problem" with Dr. Semerdjian's testimony and questioned whether the eye problem was caused by the left eye working too much or whether it was the unproductive interaction between the two eyes. The ALJ concluded that "clarification" was needed from a doctor.

The ALJ then asked the vocational expert, Richard Reidl, whether he would "care to comment on the extent to which [plaintiff] may or may not be able to [do the duties for the data entry job] with these eye limitations." R. 44. Mr. Reidl gave the following fairly long and technical answer, one that is not easy to decipher and arguably not worth quoting. But the Court does so to illustrate the analytical uncertainties about this issue:

8

> Well, I guess I'll just refer to some specific things in the DOT which in my professional opinion can be accurate or not accurate depending on each and every detail, but when you look at jobs in the extensive breakdown in all jobs and even for like a data entry clerk there would be variables such as their wording here, near acuity, far acuity, depth perception, accommodation, which is like bringing an object into focus, tunnel vision, field of vision, that they trained in very specific. And the point where I'm going with this is that for a data entry clerk and comparing it to what I think would be most pertinent and those are terms near acuity, which is defined as clarity of vision at 20 inches or less and I think even the most pertinent one probably would be accommodation, which is adjustment of lens of eye to bringing objects into sharp focus. This is somebody doing near point work comparing distances from the eye, which I think would be very prevalent in data entry type work. Anyway, the summary of that is that they raised those two factors, near acuity and accommodation, they state that they are constant for one working as a data entry clerk, so very specifically these sort of factors, while these are suggested to be things that are [] constantly needing to be done, I certainly would professionally agree with that.

R. 44-45. Like Ms. Entenberg, Mr. Reidl seems to be opining about terms, such as near and far acuity, that may have both a medical and a vocational meaning. Thus, not only is there a range of medical opinions in this case, there is a similar divergence of opinion among the vocational experts.

After Mr. Reidl gave the answer quoted above, the ALJ did not ask any follow up questions but instead turned back to Dr. Semerdjian to try to pinpoint the cause and nature of the eyestrain. The following exchanged ensured:

> ALJ:  Okay, Doctor, you might know this. You might not. If a person has one eye, is there additional strain on that eye because of the fact of doing close acuity work with that eye, meaning it would compromise additional strain with the other eye? []
>
> ME:  Well, I think if the eye is a plus 20/20 eye, I don't think there's going to be significant additional strain. To comment on your point about covering the left eye, you picked up a valid point on that I think, but I don't think that the acuity at this point would be 20/15 because I have patients who have one eye and who work full-time.
>
> ALJ:  So that's an issue.

9

>ATTY: Well, why don't I try to see if I can get some clarification from Dr. Chandra because I would think that for close-up vision, if you have to work at 95 percent accuracy and you're under the gun to get the work out, you're going to have, and you can only work with your one eye even if it's 20/20, it just makes common sense that you would have a lot of eye strain on that eye.
>
>ALJ: I'm not disputing this.

R. 44-45. Here again, a few points should be noted. Dr. Semerdjian, after prompting from the ALJ, seems to backtrack a bit from his earlier statements that were more supportive of plaintiff's theory of the case. Note also plaintiff's counsel's appeal to "common sense" in trying to figure out this issue.

At the end of the hearing, the ALJ focused on the possibility of using an eye patch to address the problem, a remedy raised *sua sponte*:

>ALJ: [] I think the key issue here is, and I want a specific answer to this, whether or not these problems the doctor mentioned would be alleviated with a patch or some other type of therapy measure, if she could just use the one eye and whether the doctor's saying that in some respects having only one eye is going to cause additional strain that would make it difficult for her use her eye constant[ly], and I understand these visual skills all have to be at the constant level. [] So if [] you can establish that that usage is degraded with just the left eye, then I think you've got a winner. If the doctor is equivocal about whether there is, you know, then we've got a problem.
>
>ATTY: Right. Okay. All right.
>
>ALJ: It comes down to, it's, now, ma'am, do you ever—see, that's the problem I'm having is she doesn't wear a patch or anything.
>
>ATTY: Right.
>
>ALJ: And I know that's a measure that's used for a number of different problems. Sometimes we have people with eye myopia, which means that one eye is so near-sighed that they can't actually give the person glasses because the brain won't accommodate that huge difference between the two eyes, so sometimes they give them patches in that situation so that they one eye is shut off from working. Frankly, I don't know the answer to this question, but if you could get a letter from Dr. Chandra, that's kind of going to be the game of that. But he's got to talk specifically about what happens to the left eye and whether or not there's any

10

>specific therapies that could be provided, such as wearing a patch that would alleviate that problem of eye strain.

R. 49-51.

After the hearing, the plaintiff provided another letter from Dr. Chandra. The letter, which is similar to the first one, does not mention an eye patch specifically, although it does make a general reference to "closing" the right eye. The letter states as follows:

>[Plaintiff] has ocular histoplasmosis which had advanced in the right eye and severely affected her central vision. Her visual acuity in the right eye is 20/100 and the left eye is 20/20. Because of severe vision loss in the right eye, she has difficulty in depth perception and working at her job and has eye strain which does not allow her to continue her work. She also states that closing her affected right eye puts all the strain on her left eye and she is unable to decipher the words required by the type of work she performs. It is possible that fine work with her good eye might put eye strain on left eye when working for a longer time.

R. 494.

To briefly sum up, the ALJ and a gaggle of experts (both medical and vocational), as well as plaintiff's counsel, all offered opinions about the nature and extent of plaintiff's eye problems, but there was no clear consensus or resolution on several key points.

On October 27, 2014, the ALJ issued his decision finding plaintiff not disabled. However, rather than confront these lurking issues, the ALJ mostly ignored them, offering a vague analysis. For this reason, the Court finds that a remand is warranted.

The Court now considers the ALJ's specific reasoning for finding that plaintiff would be able to work despite the eye limitation. As part of this finding, the ALJ concluded that plaintiff's testimony was "not entirely credible." The ALJ addressed the eye argument in two places. The first is in the following paragraph:

>[Plaintiff] does have a lengthy history of visual disturbance, particular[ly] in the right eye, going back at least to 2004 with right macular and disc edema (*see* 9F, 12F). However, the evidence as a whole does not support a conclusion that she is unable to focus sufficiently with her left eye. For example, despite her complaints

11

> regarding limited ability to focus with her good eye, she has a valid license and is still able to drive. She stated that she does not drive long distances, but she attributed this to difficulty sitting rather than her vision. She has usually denied headaches when asked by treating clinicians. Her monocular vision has been considered in restricting her from work around hazards such as unprotected heights or dangerous moving machinery, but her vision in the left eye remains intact such that she would otherwise be able to sustain work related tasks despite right eye blindness.

R. 19. Aside from the general problem already identified—that the ALJ did not confront the major issues raised at the hearing—this paragraph is not sufficient on its own terms. It contains two reasons. The first reason is clearly unsatisfactory. The ALJ claimed that plaintiff testified that her driving problems were caused *only* by her sitting difficulties and had nothing to do with her vision problems. But this assertion ignores plaintiff's testimony. She stated as follows: "*due to the limited vision* I am very cautious about driving. I rarely drive out of our little town of Lena, and *also* I don't drive long distances because of the back pain and being sedentary for too long." R. 60 (emphasis added). Perhaps the ALJ inadvertently overlooked this testimony, but whatever the reason, the ALJ was misinformed, and this rationale thus rests on a mistaken premise. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").

The second reason is that plaintiff "usually" denied having headaches. This rationale is potentially relevant. But there are still several questions that must be addressed on remand. As a factual matter, it is unclear what the ALJ meant by "usually." The ALJ did not cite to the evidence, and it is not clear how frequent plaintiff complained about headaches (if she complained at all). A separate issue is whether the ALJ considered the possibility that plaintiff may never have complained because she avoided headaches by not reading or using the computer for prolonged periods. For these reasons, the above paragraph provides an insufficient basis for rejecting plaintiff's eyestrain claim.

The second place the ALJ addressed the argument is later in the opinion where he assessed the expert opinions. The ALJ stated as follows:

> As noted above, the claimant had two hearings, and a different medical expert testified at each hearing (Dr. Munoz and Dr. Semerdjian, respectively). Both of these doctors provided thorough and detailed testimony, and they ultimately inferred the capacity for a wide range of sedentary work, subject to monocular vision that would additionally necessitate various hazard precautions, as mentioned above. These opinions are given substantial weight, as they are consistent with the evidence as a whole.
>
> Dr. Semerdjian did acknowledge that he is not an ophthalmologist, and the record does contain a statement from the claimant's treating ophthalmologist, Dr. Chandra (*see* 17F). This statement has been considered, but it is given little weight, as it is somewhat equivocal and appears to be based primarily on the claimant's subjective reports rather than any objective findings. For example, Dr. Chandra notes, "she [the claimant] also states" that closing her right eye puts strain on the left. Based on what the claimant reported regarding her difficulties, Dr. Chandra indicated, "It is possible" that performing fine work with her good eye might put strain on the left "when working for a longer time." Dr. Chandra made similar comments in another letter, and further indicated that the claimant's depth perception would be compromised due to monocular vision (16F). Dr. Chandra's comments, particularly regarding monocular vision and depth perception, have been given some weight in finding that the claimant is restricted from workplace hazards, as described above.

R. 20. This explanation is insufficient for several reasons. The main reason is that it rests on a skewed characterization of what these experts testified to. Contrary to the hearing testimony, which was mixed with no clear consensus, the ALJ's explanation pares away all this complexity and portrays the hearing as a simple battle of experts in which two out of three of them agreed with the ALJ and, further, did so by providing a "thorough" and "detailed" explanation. One reason this Court summarized the hearing testimony at length was to illustrate why the ALJ's portrayal is misleading. The Court will highlight a few points. For one thing, it is a stretch to describe Dr. Munoz's testimony as thorough, particularly on the critical issue of eyestrain headaches. The Court is still unclear why he (apparently) believed that such headaches were not possible. More problematically, the ALJ's suggestion that Dr. Munoz and Dr. Semerdjian jointly

13

and unqualifiedly opposed Dr. Chandra's opinion is not supported by the record. Plaintiff makes a credible argument that Dr. Semerdjian agreed with Dr. Chandra. As summarized above, Dr. Semerdjian's initial answers provide support for this view, which if true would mean that the scorecard should read two-to-one in plaintiff's favor. Even if one took the position that Dr. Semerdjian later backtracked to some extent on his initial opinion, then it would mean that his testimony was equivocal and tentative. To his credit, Dr. Semerdjian recognized that he was being asked to opine on an issue outside his expertise. But the ALJ's opinion washes away all such doubts and qualifications and simply announces in conclusory fashion that both Dr. Semerdjian and Dr. Munoz concluded that plaintiff had the capacity for a "wide range" of sedentary work. R. 20.

Another problem, one that plaintiff complains about, is that the ALJ did not follow the treating physician rule and specifically did not explicitly apply the checklist of factors. As explained in earlier opinions, this Court takes the view that an explicit analysis under both steps of this rule is required, including an explicit discussion of the six checklist factors. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015); *see also Trevizo v. Berryhill*, 2017 U.S App. LEXIS, 12263, *23 (9h Cir. July 10, 2017) ("the ALJ erred by failing to apply the appropriate factors . . . This failure alone constitutes reversible legal error."). Here, the ALJ clearly did not follow this rule. For example, the ALJ did not seriously consider physician's degree of specialization (fifth checklist factor). This factor strongly favored Dr. Chandra's opinion. According to plaintiff, and undisputed by the Government, Dr. Chandra was retina specialist. He was also plaintiff's treating physician. On the other hand, Dr. Munoz specialized in family practice, and Dr. Semerdjian specialized in internal medicine and pulmonology. In short, Dr. Chandra's experience (all other things being equal) meant that his

14

opinion deserved *more* weight than the other two opinions. The ALJ only acknowledged this disparity briefly, stating in passing that Dr. Semerdjian "acknowledge[d] that he is not an ophthalmologist." But there is no sense that the ALJ gave this factor any weight.

As for the supportability and consistency (the third and fourth checklist factors), there is no sense that the opinions of Dr. Munoz and Dr. Semerdjian were more consistent, or fit better with the overall evidence. Again, the summary of the hearing testimony illustrates this point. As noted previously, Dr. Munoz offered no theoretical justification for his main conclusion about eyestrain. As for Dr. Semerdjian, to the extent that his opinion could be interpreted as being supportive of the ALJ, it rested mostly on the anecdotal observation that he had patients "who have one eye and who work full-time." R. 45. But this answer does not address the issue here of whether it was the *interaction* between the two eyes, and not merely having only one eye, that caused the problem. Also, Dr. Semerdjian did not provide any details about what jobs these patients had—specifically, whether they typed full-time. For all these reasons, on remand, the ALJ should explicitly apply the steps of the treating physician rule.

It is true, as the ALJ stated, that Dr. Chandra only opined that it was "possible" that plaintiff's histoplasmosis caused headaches and that he appeared to be relying on plaintiff's subjective complaints to some degree. The ALJ certainly may consider these factors along with the others in evaluating Dr. Chandra's opinion on remand. However, the larger problem with the ALJ's analysis is that that the ALJ never addressed the deeper ambiguity that existed throughout the hearing. One might believe, as apparently Dr. Munoz did, that plaintiff's condition simply could not cause eyestrain and headaches as she claimed. This would be closer to a medical judgment about the nature of these illnesses, and about the way the eye and brain work. Alternatively, one could believe, as apparently Dr. Semerdjian and Dr. Chandra did, that it was

15

*possible* that the histoplasmosis-related damage could *in theory* cause the headaches and thereby prevent plaintiff from working full-time at a computer screen. Under this second scenario, one would then have to further assess whether plaintiff was believable in claiming that *she* was, in fact, experiencing these headaches and eyestrain in the way she claimed. This judgment would turn more on the credibility analysis than on the medical analysis. But these are two different analytical paths, and it is not clear which one the ALJ took. It is also not clear whether or how the ALJ assessed the issue of the eye patch. Even though the ALJ identified the eye patch as being the key unresolved issue, the ALJ never mentioned it in the written decision. If the ALJ ultimately concluded for some reason that using an eye patch was not a possible solution, the ALJ should have acknowledged as much given all the emphasis placed on it at the hearing.

To sum up on the eye issue, the Court finds that a remand is required to address these issues. At this point, the Court is not expressing any opinion on the ultimate outcome and recognizes that more analysis may not lead to an easy (or different) answer on remand. It is tempting to dismiss eyestrain as a relatively minor problem, and also to believe that it can be easily evaluated by the layperson. For example, the Mayo Clinic website refers to it as a "common condition" where "your eyes get tired from intense use, such as while driving long distances or staring at computer screens," and states that it "usually isn't serious" and "goes away once you rest your eyes." At the same time, it is *possible* that there are deeper, less understood technical issues that may be overlooked in such a layperson analysis. In the hearings, the experts used a number of terms, such as near acuity and central vision, that *may* indicate issues that are not readily apparent to the ALJ and this Court. For this reason, on remand, the ALJ should seek the opinion of an expert with experience and training in ophthalmology.

HALLEX I-2-5-34A.1. In the second hearing, the ALJ himself stated that "clarification" was needed from a doctor.

Having concluded that a remand is required on this issue, the Court need not address all of plaintiff's remaining arguments, many of which are more minor and would not necessitate a remand. Nevertheless, in fairness to plaintiff, it should be noted that she has argued strenuously that it is the *combination* of all her numerous impairments (including pain from fibromyalgia, hand problems, kidney issues), and not just the eye problem, that makes it impossible for her to work full-time as a data entry clerk. It is often difficult to evaluate an argument that an ALJ failed to consider the cumulative effect of impairments especially when, as here, the ALJ included general language indicating that such an inquiry had been undertaken. However, as the Seventh Circuit has emphasized, it is important that ALJs consider the cumulative impairments, and ALJs should provide more analysis to ensure that this inquiry has been fulfilled.

Plaintiff specifically complains that the ALJ failed to consider the added burden from her obesity and, in particular, the possibility that it may affect her ability to sit for an entire work day. She cites to *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014) where the Seventh Circuit noted the following: "[T]he likely difficulties that morbidly obese persons . . . face even in doing sedentary work are sufficiently obvious to have required the [ALJ] to instruct the consulting physician to consider the potential effect of the plaintiff's obesity on her ability to do sedentary work." *Id.* at 707. It is true that the ALJ stated that plaintiff's impairments had "been considered in combination with her obesity," but there was little evidence that the ALJ gave it any serious consideration. R. 18. The ALJ did not mention in this statement that plaintiff was almost morbidly obese. Also, Dr. Semerdjian identified obesity, along with the eye problem, as the two

17

major issues affecting plaintiff. The ALJ's decision does not reflect this emphasis.[6] On remand, the ALJ should explicitly consider the combined effect of plaintiff's obesity and other impairments, as required by Seventh Circuit case law and Social Security regulations.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: July 25, 2017          By: _____
                                 Iain D. Johnston
                                 United States Magistrate Judge

---

[6] Another point, perhaps a small one, is the ALJ's RFC finding that plaintiff could occasionally crawl, crouch, stoop, and climb stairs. Even when limited to occasional use (defined by SSR 96-9p as occurring from "very little up to one-third of the time"), it seems doubtful that a 233-pound woman, already limited to sedentary work because of hip and other pains, could do such activities.

18